# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TRACEY G.[1],
     Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

Case No. 1:20-cv-980

Litkovitz, M.J.

**ORDER**

Plaintiff Tracey G. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying plaintiff's application for disability insurance benefits ("DIB") and supplemental

security income ("SSI").  This matter is before the Court on plaintiff's statement of errors (Doc.

17), the Commissioner's response in opposition (Doc. 20), and plaintiff's reply memorandum

(Doc. 21).

## I.  Procedural Background

On May 21, 2018, plaintiff protectively filed a Title II application for DIB.  Plaintiff also

protectively filed a Title XVI application for SSI on August 15, 2018.  In both applications, she

alleged disability beginning October 6, 2017 due to bipolar disorder, personality disorder,

degenerative disc disease, chronic obstructive pulmonary disease (COPD), status post total

arthroscopy of the right knee, osteoarthritis of the left knee, obstructive sleep apnea, diabetes

mellitus, hypertension, and obesity.  These claims were denied initially and upon

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

reconsideration.  Plaintiff, through counsel, requested and was granted, a *de novo* hearing before

ALJ Thuy-Anh T. Nguyen.  Plaintiff and a vocational expert ("VE") appeared and testified at the

February 25, 2020 hearing.  On May 6, 2020, the ALJ issued a decision denying plaintiff's DIB

and SSI applications.  This decision became the final decision of the Commissioner when the

Appeals Council denied review on October 9, 2020.

**II.  Analysis**

    **A.  Legal Framework for Disability Determinations**

        To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  The impairment must render the claimant unable to engage in the work

previously performed or in any other substantial gainful employment that exists in the national

economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

        Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

    1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

    2) If the claimant does not have a severe medically determinable physical or
mental impairment – *i.e.*, an impairment that significantly limits his or her
physical or mental ability to do basic work activities – the claimant is not
disabled.

    3) If the claimant has a severe impairment(s) that meets or equals one of the
listings in Appendix 1 to Subpart P of the regulations and meets the duration
requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The [plaintiff] has not engaged in substantial gainful activity since October 6, 2017, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: status post total arthroplasty of the right knew; osteoarthritis of the left knee; disorders of the spine; chronic hypoxemic respiratory failure (CHRF); chronic obstructive pulmonary disease (COPD); obesity; obstructive sleep apnea (OSA); bipolar disorder; and attention-deficit-hyperactivity disorder (ADHD). (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  She can occasionally balance, stoop, and crouch, but never kneel or crawl.  She can occasionally operate foot controls with the bilateral lower extremities.  She must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and fumes, odors, dusts, gasses, and poor ventilation.  She must avoid unprotected heights and dangerous machinery.  She can understand, remember, and carry out simple, routine tasks in which duties are routine, predictable and repetitive.  She is limited to occasional, superficial interaction with co-workers and supervisors, with superficial defined as no tandem tasks.  She is limited to no interaction with the general public.  She can adapt to a setting in which duties are routine, repetitive and predictable.  She must be able to use an oxygen tank during the workday.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. The [plaintiff] . . . was 44 years old, which is defined as a younger individual . . . on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).[3]

---

[2] Plaintiff's past relevant work was as a cashier (light exertion), janitor (medium job performed at the light level of exertion), server (light exertion), and assistant manager (performed at the light level of exertion).  (Tr. 29).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from October 6, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-30).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

---

unskilled, sedentary work such as assembler (30,000 jobs in the national economy), inspector (15,000 jobs in the national economy), and hand trimmer (10,000 jobs in the national economy).  (Tr. 20-30, 63).

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D.  Specific Errors

On appeal, plaintiff argues that the ALJ improperly evaluated the medical evidence and failed to carry the step five burden.  (Docs. 17 and 21).

The Commissioner counters that the ALJ properly weighed the medical evidence and crafted an RFC that was supported by substantial evidence.  None of plaintiff's physicians ever opined that plaintiff was disabled or had any work limitations at all, and a consultative examiner used only vague and undefined terms which the ALJ reasonably explained were not persuasive. As such, the ALJ properly considered the medical opinions of the state agency reviewing physicians and psychologists and determined that while they were partially persuasive, later evidence required greater restrictions than they opined.  (Doc. 20).

### E.  Pertinent Medical Evidence

#### 1.  *Physical Impairments*

##### a.  *COPD/Pulmonary Issues*

Plaintiff saw pulmonary specialist, Gregory Colangelo, M.D., in February 2017 due to coughing and shortness of breath.  (Tr. 1137).  On examination, plaintiff exhibited decreased breath sounds but no wheezing.  Dr. Colangelo assessed tobacco use disorder, shortness of breath, chronic cough, COPD, mild pulmonary hypertension, and hemoptysis.  Dr. Colangelo ordered a bronchoscopy to evaluate plaintiff's hemoptysis further and a sleep study.  Dr.

Colangelo reviewed plaintiff's overnight oximetry and recommended that she stop smoking and begin using supplemental oxygen. (Tr. 1138).

By April 11, 2017, plaintiff had stopped smoking, and her shortness of breath improved. (Tr. 1142). A polysomnography indicated severe sleep apnea, and Dr. Colangelo recommended a CPAP device. (*Id.*). Pulmonary function testing was normal except for an elevated residual volume indicative of small airway disease, a component of mild COPD. (Tr. 1142). Plaintiff's oxygen saturation level measured at 96 percent. (Tr. 1144).

On November 7, 2018, plaintiff reported that she could not tolerate the CPAP device, but she utilized supplemental oxygen at night. (Tr. 1148). Her oxygen saturation tested at 88 percent, and Dr. Colangelo instructed plaintiff to increase supplemental oxygen use. (*Id.*).

Plaintiff reported for follow-up on November 27, 2018. Although she no longer smoked, she was exposed to "significant second hand smoke." (Tr. 1157). Her oxygen saturation tested at 96 percent on room air. (Tr. 1159).

On December 1, 2018, plaintiff's oxygen saturation level measured at 95 percent. (Tr. 1103). On January 28, 2019, plaintiff's oxygen saturation level again dropped to 88 percent, and Dr. Colangelo noted that CT imaging showed some mild emphysematous changes. (Tr. 1164). He recommended that plaintiff use supplemental oxygen 24 hours per day. (*Id.*). On October 11, 2019, plaintiff's oxygen saturation level measured at 95 percent. (Tr. 1285).

Treatment with her primary care physician, Emmett Roper, M.D., showed normal pulmonary examinations on October 19, 2018, May 24, 2019, October 23, 2019, and January 6, 2020. (Tr. 1262, 1265, 1274, 1278).

7

    *b.  Orthopedic Issues*

Plaintiff saw Dr. Roper in May 2017, complaining of bilateral lower extremity swelling and a mixture of numbness and pain. (Tr. 387).  Plaintiff reported that the swelling worsened when she was on her feet at work every day, but it improved when she elevated her feet after work.  (*Id.*).  Musculoskeletal examination showed tenderness at the bilateral pretibial lower extremities, but she exhibited no edema or deformity.  Dr. Roper prescribed Lasix as needed for swelling.  (*Id.*).

On April 5, 2018, during a post right knee arthroplasty physical therapy session, plaintiff reported returning to work part-time six days per week at a drive through.  She further reported that she was able to independently complete activities of daily living, walk normal distances, and stand without limitation.  (Tr. 1058).  On examination, plaintiff exhibited a normal range of motion in the right lower extremity, right knee flexion at 5/5, and right knee extension at 5/5.  (*Id.*).

 Plaintiff saw Dr. Roper on July 18, 2018, for a follow-up on her osteoarthritis back pain. (Tr. 443).  Plaintiff was not taking medication for pain; her examination was normal; and Dr. Roper prescribed diclofenac.  (Tr. 443-44).

On August 23, 2019, plaintiff presented to the emergency department at Mercy Health following a domestic assault.  (Tr. 1229).  On examination, she exhibited a full range of motion in the bilateral hips, bilateral knees, and bilateral ankles without pain.  (Tr. 1234). A CT scan taken of plaintiff's cervical spine showed degenerative changes including moderate disc height

loss and endplate spurring.  (Tr. 1239).  Spinal x-rays taken on August 28, 2019 revealed advanced L4/L5 spondylosis/spondylolisthesis.  (Tr. 1197).

On September 26, 2019, plaintiff reported intermittent right knee pain two years post right knee arthroplasty.  (Tr. 1303).  Plaintiff noted that she served as primary care giver for her grandmother seven days per week, a job which "requires a lot of walking, standing, lifting pushing, and pulling."  (*Id.*)  The examination revealed no swelling or tenderness; her range of motion was 0 to 120 degrees; and she had full strength with flexion and extension.  (Tr. 1303).

> c.  *State Agency Review*

On October 19, 2018, state agency medical consultant Elisabeth Das, M.D., reviewed plaintiff's medical records and determined that plaintiff could perform light exertional work. (Tr. 146-47, 151).  Specifically, Dr. Das concluded plaintiff could lift or carry 10 pounds frequently; stand or walk (with normal breaks) six hours per day; sit (with normal breaks) six hours per day; occasionally climb ramps or stairs, stoop, or crouch; never climb ladders, ropes, or scaffolds; and never kneel or crawl.  (Tr. 146).

On March 14, 2019, state agency medical consultant Steve E. McKee, M.D., reviewed plaintiff's medical records and determined that plaintiff could perform light exertional work. (Tr. 179-81, 183).  Like Dr. Das, Dr. McKee opined that plaintiff could lift or carry 10 pounds frequently; stand or walk (with normal breaks) six hours per day; sit (with normal breaks) six hours per day; occasionally climb ramps or stairs, stoop, or crouch; never climb ladders, ropes, or scaffolds; and never kneel or crawl.  (Tr. 179-80).

2. *Mental Impairments*

    a. *Butler Behavioral Health*

Plaintiff sought mental health treatment through Butler County Behavioral Health beginning on May 13, 2019. She was seen for a medsom evaluation and medication management, having been diagnosed previously with bipolar disorder 2 and ADHD. (Tr. 1306-15). Plaintiff presented as depressed, angry, and tearful. (Tr. 1306). She wore two liters of oxygen. (*Id.*). At that time, plaintiff reported she was homeless and living with a friend, having separated from her husband. (*Id.*). On mental status examination, plaintiff exhibited appropriate speech, alertness, grooming, eye contact, cooperation, and associations; fair judgment; intact memory; good attention; and appropriate language. Her affect was depressed, tearful, irritable, anxious, and labile. (Tr. 1310-11). She was not a risk to self or others. (Tr. 1311). The record shows plaintiff treated conservatively with medication, including Trileptal, Wellbutrin, Benzotropine, and Dextroamphetamine-amphetamine. (Tr. 1312).

Treatment notes from September 2019 indicated that plaintiff's husband was incarcerated for assaulting plaintiff, and she felt better out of that abusive environment. (Tr. 1349). She appeared "more bright and calmer." (*Id.*) Plaintiff's mental status examination revealed intact speech; she was alert and oriented times four, with appropriate affect, grooming, eye contact and cooperation; she exhibited intact memory, circumstantial thought processes, fair judgment, and good concentration. (Tr. 1354-55).

Plaintiff completed an annual mental health assessment in December 2019. (Tr. 1381). Plaintiff reported that:

> life has been overwhelming with being a caretaker for her grandmother full-time
> as well has having to go to court frequently for a domestic violence case. [Plaintiff]
> states her husband attempted to kill her and has been in Hamilton County jail since
> August of 2019. [Plaintiff] reports she has been experiencing crying episodes-
> "melt downs, 1 to 2x a day," mood swings, irritability, and insomnia- 2 to 3 hours
> a day.

(*Id.*). At that time, plaintiff requested to continue with outpatient services with case management

and medsom evaluations. (*Id.*).

On January 23, 2020, plaintiff reported, "I feel better right now than I have in my life."

(Tr. 1389). Her mental status examination revealed blunted affect, but intact and appropriate

speech, orientation, gait, alertness, grooming, eye contact, cooperation, associations, memory,

and judgment. (Tr. 1393-94). Her attention and concentration were noted as "good." (Tr.

1394).

### b. Consultative Examiner Jessica Twehues, Psy.D.

Dr. Twehues examined plaintiff for disability purposes on November 9, 2018. (Tr. 759-

64). Plaintiff reported she is disabled due to physical health problems, as well as depression.

She quit work due to physical health problems. She presented as superficially pleasant but

seemed agitated and defensive. She gave some vague information related to her past including a

history of violence and arrests. On mental status examination, plaintiff maintained fair eye

contact, and she was noted to be pleasant and cooperative. She appeared depressed, but was

alert, responsive, and oriented to person, place, time, and situation. (Tr. 761-62). Dr. Twehues

diagnosed plaintiff with an unspecified depressive disorder and a personality disorder. (Tr. 763).

Dr. Twehues found that plaintiff was "not expected to show limitations" in her ability to

understand, remember and carry out instructions, but she "would expect somewhat higher than

usual rates of absenteeism from work as a result of depressive symptoms." (*Id.*).  Dr. Twehues determined that plaintiff would have moderate limitations in social interaction.  She stated that plaintiff is "likely to present as easily defensive," "appears prone to occasional agitated outbursts," and "may misinterpret the benign actions of others as suspicious."  (Tr. 764).  Dr. Twehues also concluded that plaintiff would have "moderate to potentially severe limitations" in responding to work pressures based on her reports "that she is easily overwhelmed with stress," and had "a history of substance abuse in years past."  (*Id.*).

   *c.  State Agency Review*

  Cynthia Waggoner, Psy.D., reviewed plaintiff's file in November 2018, and found that plaintiff had no limitations in understanding, remembering, or applying information and moderate limitations in interacting with others; concentrating, persistence, or maintaining pace; and adapting or managing oneself.  (Tr. 118).  Dr. Waggoner opined that plaintiff could carry out simple one to four step tasks and adapt to a setting in which duties are routine and predictable. However, plaintiff should be limited to occasional superficial interaction with coworkers and supervisors and no interaction with the general public.  (Tr. 131-32).

  Paul Tangeman, Ph.D., reviewed plaintiff's file upon reconsideration in March 2019, and found that plaintiff had mild limitations in understanding, remembering, or applying information. (Tr. 162).  Dr. Tangeman opined that the mental health restrictions from the prior ALJ's decision in March 2014 should be adopted pursuant to Acquiescence Ruling 98-4(6).  (Tr. 167).

### 3. Vocational Expert

The VE testified that a person of plaintiff's age, education, and past work who requires use of an oxygen tank could perform unskilled sedentary work. (Tr. 62-63). Potential jobs include assembler (30,000 jobs), inspector (15,000 jobs), and hand trimmer (10,000 jobs). (Tr. 63). According to the VE, adding a requirement for leg elevation to heart level one hour each workday would disqualify a person from these jobs as would routine absenteeism of two or more days each month. (Tr. 63-65).

### F. The ALJ's Evaluation of the Medical Opinion Evidence is Supported by Substantial Evidence

For claims filed on or after March 27, 2017, new regulations apply for evaluating medical opinions. *See* 20 C.F.R. § 404.1520c (2017) and 20 C.F.R. § 416.920c; *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). These new regulations eliminate the "treating physician rule" and deference to treating source opinions, including the "good reasons" requirement for the weight afforded to such opinions.[4] *Id.* The Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[5], including those from your medical sources." 20 C.F.R. §

---

[4] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[5] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850. For clarity, the Court will refer to the limitations opined by the state agency reviewing physicians

404.1520c(a); 20 C.F.R. § 416.920c(a). Rather, the Commissioner will consider "how persuasive" the medical opinion is. 20 C.F.R. § 404.1520c(b); 20 C.F.R. § 416.920c(b).[6]

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 416.920c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[7] and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 416.920c(c)(2). The ALJ is required to "explain how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 416.920c(b)(2). Conversely, the ALJ "may, but [is] not required to, explain" how he/she

and psychologists as "assessments" or "opinions."

[6] "The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical." *Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, at *1 n. 1 (S.D. Ohio Sept. 9, 2019) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). For claims filed on or after March 27, 2017, these regulations are found at 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920c, respectively. The Court's references to DIB regulations should be read to incorporate the corresponding and identical SSI regulations, and vice versa, for purposes of this Order.

[7] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

14

considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 404.1520c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 404.1520c(d).

Plaintiff generally alleges that the ALJ erred in evaluating the medical record. The Court notes that none of plaintiff's treating physicians or other practitioners gave an opinion on plaintiff's ability to perform work-related activities from either a physical or mental health standpoint. Therefore, the only opinion evidence the ALJ evaluated was from the state agency consultants and consultative examiner Dr. Twehues.

The ALJ found the opinions of state agency physicians Das and McKee only "partially persuasive" because they were not restrictive enough. (Tr. 27). Specifically, the ALJ concluded that their opinions were "consistent with the medical evidence available at that time," but more recent evidence indicates "the [plaintiff's] breathing issues necessitate the use of an oxygen tank 24 hours per day and the combined impact of her other severe impairments, including knee and back pain, result in further limitations." (Tr. 27). In addition, medical evidence "confirms the [plaintiff's] severe mental impairments result in limitations in the categories set forth in the mental listings." (Tr. 28). "[A]s the result of the [plaintiff's] mental impairments, including bipolar disorder and ADHD," the ALJ included additional limitations in plaintiff's RFC. (Tr. 28). Plaintiff does not appear to take issue with the ALJ's evaluation of this evidence.

15

However, plaintiff contends that the ALJ should have given more weight to consultative examiner Dr. Twehues' opinion that she would "expect somewhat higher than usual rates of absenteeism from work as a result of depressive symptoms." (Doc. 17 at PAGEID 1477 (quoting Tr. 763-64)). The ALJ considered Dr. Twehues' November 2018 opinion but found it "unpersuasive in that it uses undefined and vague terms." (Tr. 28). The ALJ noted the inconsistency between Dr. Twehues' opinion and plaintiff's mental health treatment records from Butler County Behavioral Health. (Tr. 25-26). Specifically, the ALJ stated that plaintiff's treatment notes (contained at Tr. 1306-1398) demonstrate that plaintiff's "severe mental impairments have been treated conservatively with medication"; she repeatedly "showed intact grooming, cooperative affect, intact memory, good attention and appropriate knowledge"; that "[s]ince the onset date, there is no record of in-patient psychiatric hospitalizations, suicidal or homicidal ideation"; and that "[w]hile the [plaintiff] reported feeling depressed during treatment, many of her mental status exams were otherwise normal." (Tr. 26).

The ALJ's evaluation of Dr. Twehues' opinion is supported by substantial evidence. Plaintiff's mental health treatment notes from May 13, 2019 indicate that plaintiff felt depressed and requested medication changes, but she denied all desire to harm herself or others; denied hospitalization since 2012 or visits to an emergency department for psychological symptoms; denied panic attacks and psychoses; and denied alcohol or non-prescribed drug use. (Tr. 1307). While she appeared tearful, depressed, and irritable, the treatment provider found her to be alert and oriented with appropriate speech, grooming, eye contact, cooperation, associations, memory, attention, concentration, and language. (Tr. 1310-11). On May 30, 2019, plaintiff reported

16

being less depressed and feeling best when she was caring for her bedridden grandmother. (Tr. 1316-17). The treatment provider reported plaintiff smiling and sharing photographs. (*Id.*) Although the treatment provider found plaintiff's affect depressed and blunted, plaintiff was alert and oriented, and she demonstrated appropriate speech, grooming, eye contact, cooperation, associations, memory, attention, concentration, and language. (Tr. 1320-21).

On July 17, 2019, plaintiff reported continued depression but "laughing, joking more" and "feels better but sad a lot." (Tr. 1328). On mental status examination, plaintiff displayed a depressed and blunted affect, circumstantial thought process, and fair judgment. The remainder of her mental status exam was normal. (Tr. 1332-33). Plaintiff's treatment notes from August 14, 2019, reflect similar findings.

As the ALJ noted, however, by September 2019 plaintiff's mental status exam reflected intact and appropriate affect (not depressed). (Tr. 26, 1354). Plaintiff reported feeling better as she was no longer in an abusive environment, and appeared "more bright and calmer than previous appts." (Tr. 1349). Plaintiff's thought process was observed as circumstantial, but her affect and remaining mental status exam findings were normal. (Tr. 1354-55). In October 2019, plaintiff displayed a labile affect, circumstantial thought process, and fair judgment. Her other mental status findings were normal. (Tr. 1364-65).

In November 2019, plaintiff again reported feeling better given her living arrangements, and she appeared "more bright and calmer than previous appts." (Tr. 1370). The treatment provider found plaintiff's affect intact and appropriate and her thought process was circumstantial. Her remaining mental status findings were normal. (Tr. 1375-76).

17

At her January 23, 2020 appointment (the final appointment included in the record), plaintiff reported feeling "nervous" about the future but stated, "I feel better right now than I have in my life." (Tr. 1389). Although plaintiff displayed a blunted affect and circumstantial thought process, she displayed normal findings on the remainder of the mental status examination. (Tr. 1393-94).

The ALJ's finding that Dr. Twehues' 2018 opinion was inconsistent with the 2019 and 2020 mental health treatment records finds substantial support in the record. The Butler County Behavioral Health treatment records show improvement in plaintiff's mental functioning with treatment, as well as largely normal mental status findings, despite her reports of feeling depressed. Accordingly, the ALJ did not err in her assessment of Dr. Twehues' opinion.

### G. The ALJ's Evaluation of Plaintiff's Symptom Severity and Residual Functional Capacity (RFC) Finding are Supported by Substantial Evidence

ALJs are to "consider all of the evidence in an individual's record" and determine whether the individual is disabled by examining "all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2. ALJs also evaluate what the agency formerly termed the "credibility" of a plaintiff's statements about his or her symptoms. *See, e.g.*, *Rogers*, 486 F.3d at 246-49. In March 2016, the agency eliminated its use of the term "credibility" and clarified "that subjective symptom evaluation is not an examination of an individual's character. . . ." SSR 16-3p, 2016 WL 1119029, at *1 (March 16, 2016) (rescinding and superseding SSR 96-7p). To avoid such mistaken emphasis, this analysis is now characterized as the "consistency" of a claimant's

subjective description of symptoms with the record.  *See Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 n.3 (6th Cir. 2020) (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)).

A two-step inquiry applies to symptom evaluation.  The ALJ first determines if the record contains objective medical evidence of an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms.  SSR 16-3p, 2016 WL 1119029, at *3; *see also* 20 C.F.R. § 404.1529(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003).  Step two of symptom evaluation shifts to the severity of a claimant's symptoms.  The ALJ must consider the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.  *See* 20 C.F.R. §§ 404.1529(a) and (c); SSR16-3p, 2016 WL 1119029, at *4.  In making this determination, the ALJ will consider the following:

(i)      Your daily activities;

(ii)     The location, duration, frequency, and intensity of your pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)      Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)     Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii)    Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

An ALJ may not consider only objective medical evidence in determining disability unless this evidence alone supports a finding of disability. SSR 16-3p, 2016 WL 1119029, at *5 ("If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms."); 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Moreover,

> [i]t is . . . not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *9. *See also id.* at *7 (noting that the ALJ "will discuss the factors pertinent to the evidence of record").

At the same time, the ALJ is not required to cite or discuss every factor used to evaluate the consistency of a plaintiff's description of symptoms with the record evidence. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) ("[T]he ALJ expressly stated that she had considered [the predecessor to SSR 16-3p], which details the factors to address in assessing

credibility. There is no indication that the ALJ failed to do so. This claim therefore lacks merit. . . ."). Further, the ALJ's determination regarding the consistency of a claimant's subjective complaints with the record evidence is "to be accorded great weight and deference. . . ." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of H.H.S.*, 818 F.2d 461, 463 (6th Cir. 1987)).[8]

Plaintiff contends that the ALJ erred in evaluating plaintiff's symptom severity and argues her limitations are consistent with: (1) an oxygen saturation level of 88 percent; (2) back pain as supported by the August 23, 2019 CT scan and x-ray; (3) foot swelling as supported by Dr. Roper's May 15, 2017 medical note; and (4) consultative examiner Dr. Twehues' opinion that she "would expect somewhat higher than usual rates of absenteeism from work as a result of depressive symptoms." (Doc. 17 at PAGEID 1475-1477 (quoting Tr. 763)). According to plaintiff, the evidence shows she does not have an RFC for full-time employment. The Commissioner responds that the ALJ properly considered plaintiff's symptom severity and the limiting effects of plaintiff's reported pain. (Doc. 20 at PAGEID 1502-1507). The ALJ's decision that plaintiff's subjectively reported symptoms were not entirely consistent with the medical and other evidence of record is supported by substantial evidence.

First, with regard to the plaintiff's oxygen saturation rate, the ALJ reasonably limited plaintiff to only sedentary work with additional "exertional, postural and environmental

---

[8] The *Walters* court noted that substantial deference was appropriate due in large part to an ALJ's unique observation of a witness's "demeanor and credibility." With the elimination of the term "credibility" in SSR 16-3p, it is questionable whether an ALJ's observations should be given any deference. At least one Sixth Circuit decision subsequent to the enactment of SSR 16-3p, however, has retained the notion of deference to the ALJ in the symptom-consistency context. *See, e.g., Lipanye*, 802 F. App'x at 171 ("It is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements.").

limitations, as well as the allowance of supplemental oxygen use." (Tr. 24). In addition, as the ALJ explained, plaintiff's oxygen saturation rate improved significantly after she stopped smoking and began using supplementary oxygen throughout the day. (*Id.*). Since April 2017, treatment notes indicate plaintiff's pulmonary effort as "normal," and her oxygen saturation levels repeatedly tested at 95 percent or higher. (Tr. 418, 422, 1142, 1144 (98%), 1156, 1158 (96%), 1262, 1269, 1274, 1278, 1285 (95%), 1290 (96%), 1291 ("[l]ung volumes reveal normal total lung capacity . . . [r]esidual volume has increased by 29%"); *but see* Tr. 1164 (January 28, 2019 note reporting 88% oxygen saturation while living with a smoker and using supplemental oxygen only at night)).

Second, the ALJ accurately discussed plaintiff's history of back pain, including the August 2019 imaging plaintiff references in her statement of errors. (Tr. 25, Doc. 17 at PAGEID 1475). The ALJ reasonably determined that plaintiff's allegations of debilitating limitations from back pain were not entirely consistent with the medical evidence. The ALJ noted plaintiff received only conservative treatment for back and neck pain. (Tr. 25). She further noted that plaintiff does not take narcotic pain medication and takes only muscle relaxers for her back pain. (*Id.*) Nonetheless, the ALJ reasonably included additional postural limitations in the RFC to account for the plaintiff's back pain. (Tr. 25).

Third, citing Dr. Roper's May 15, 2017 medical note (Tr. 387) in which plaintiff complained of foot swelling and pain, plaintiff contends that even the VE testified that an individual with the plaintiff's other limitations would be unable to sustain sedentary, unskilled work if she had to elevate her legs above her heart for an hour every workday. (Doc. 17 at

PAGEID 1476).  Plaintiff accurately restates the VE's testimony, but she fails to identify a single medical record in which a physician has ever advised or required plaintiff to elevate her legs. (*Id.*)  Indeed, as of April 13, 2018, medication for swelling no longer appeared on the plaintiff's medications lists.  (Tr. 419-420).  During a September 26, 2019 medical visit, plaintiff complained of knee pain and reported that she served as primary care giver for her grandmother, a job which "requires a lot of walking, standing, lifting, pushing, and pulling."  (Tr. 1303). Plaintiff was advised "to stay active and continue home exercises" even though she reported that the pain was "much worse after activity."  (Tr. 1304).  No medical evidence of record indicates that plaintiff must elevate her legs above her heart for an hour every workday.  The ALJ did not err by failing to include this limitation in the RFC.

Finally, plaintiff alleges her mental health complaints are consistent with her Butler Behavioral Health treatment records.  Plaintiff cites to her December 2019 complaint to her mental health provider that she was experiencing daily "melt downs" and "mood swings" in contending that the ALJ did not take into account that depression may lead to increased absenteeism from work and an inability to sustain the focus necessary for work activities.  (Doc. 17 at PAGEID 1476-77).

The ALJ acknowledged that plaintiff often presented as depressed during treatment.  (Tr. 26).  However, the ALJ noted that plaintiff's mental health impairments have been treated conservatively using medication and that plaintiff has experienced no psychiatric hospitalizations or emergency room visits and no suicidal or homicidal ideation since the alleged onset date.  (*Id.*) Furthermore, consistent with the citations to the record above, the ALJ found that plaintiff's

mental status exams were otherwise normal.  (*Id.*).  Plaintiff consistently displayed intact memory, and her mental health care providers repeatedly noted her to be oriented to person, place and time, with normal behavior and thought content.  (Tr. 1310-11, 1320-21, 1332-33, 1375-76, 1393-94).

Plaintiff further argues the medical evidence is consistent with Dr. Twehues' opinion that plaintiff would be unable to sustain the focus necessary to perform work-related tasks.  As discussed above, substantial evidence supports the ALJ's assessment of Dr. Twehues' opinion. Nevertheless, the ALJ reasonably imposed additional restrictions that plaintiff understand, remember and carry out only simple, routine tasks in which duties are routine, predictable and repetitive to accommodate any reduced stress tolerance and ensure plaintiff can maintain sufficient concentration, persistence, and pace.  (Tr. 27).  Although finding Dr. Twehues' opinion unpersuasive and vague, the ALJ added limitations to plaintiff's RFC to account for plaintiff's mental impairments, consistent with the "objective evidence of record."  (Tr. 28). Accordingly, the ALJ's evaluation of plaintiff's symptom severity and RFC finding are support by substantial evidence.

Based on the foregoing, plaintiff's statement of errors (Doc. 17) is **OVERRULED.  IT IS THEREFORE ORDERED THAT** the decision of the Commissioner is **AFFIRMED**, judgment be entered in favor of the Commissioner, and this case is **CLOSED** on the Court's docket.

Date:    6/17/2022

Karen L. Litkovitz
United States Magistrate Judge

24